## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOHN ALBERT MILLER, IV       *

Plaintiff       *

v       *       Civil Action No. JKB-11-3572

MARY ANN SAAR, et al.       *

Defendants       *
      ***

### MEMORANDUM

Pending is defendants' motion to dismiss or for summary judgment. ECF No. 18. Plaintiff opposes the motion. ECF No. 23. Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, defendants' motion, construed as a motion for summary judgment, shall be granted.

### Background

Plaintiff states he was a death-row prisoner at Maryland Correctional Adjustment Center (MCAC) beginning on February 11, 2000. On February 19, 2004, the Maryland Court of Appeals vacated plaintiff's death sentence and remanded his case to the Circuit Court for Baltimore County. When his death sentence was vacated, plaintiff was left with a sentence of 35 years. On May 28, 2004, correctional officials concluded that plaintiff must be housed at MCAC because Maryland statutory law required that assignment. Plaintiff alleges he has since learned that there is no statute which required him to be confined at MCAC, but that he was confined there at the behest of family members of the victim in his criminal case. ECF No. 1 at p. 9.

On May 23, 2005, plaintiff states that defendants informed him he would need to be kept on death-row even though his death sentence had been vacated. Plaintiff remained assigned to death-row until July 6, 2009, and claims the assignment caused him to develop emotional

disorders.  Plaintiff claims he was informed on May 31, 2006, that because he was awaiting resentencing on the vacated death penalty case he would be re-evaluated for a transfer if he was sentenced to "something other than death."  Plaintiff claims there was no regulation requiring that he stay on death-row or kept at MCAC after his death sentence was vacated; defendants knew he was not supposed to be housed on death-row or at MCAC; and he should have been transferred when his death sentence was vacated.  ECF No. 1 at pp. 10 – 12.

On August 6, 2008, plaintiff was moved from death-row to general population, but remained at MCAC.  Shortly thereafter plaintiff was recommended and approved by the Warden for a transfer to any medium security facility.  Plaintiff claims this decision is evidence that defendants knew his assignment to death-row and/or MCAC was improper.  The Commissioner of Correction disapproved the transfer, requiring that plaintiff remain in maximum security pending the outcome of his court appearance scheduled for November 11, 2008.  ECF No. 1 at pp. 14 – 15.

On November 17, 2008, plaintiff was resentenced in the Circuit Court for Baltimore County, Maryland to serve life without the possibility of parole.  Plaintiff remained housed at MCAC for another eight months under conditions which he describes as constituting an "atypical and significant hardship."  He states that because no other explanations were provided for leaving him at MCAC, "it can only be presumed" that it was due to the "malice" of the victim's family which was "adopted and implemented" by defendants.  ECF No. 1 at pp. 17 – 18.

On July 20, 2009, plaintiff was approved for a reduction in his security level from "Max II to Max Security."  He was approved for a transfer to North Branch Correctional Institution (NBCI), but was not transferred for another five months.  Plaintiff claims there was no housing

2

shortage to justify leaving him at MCAC for five months after he was approved for transfer. ECF No. 1 at p. 18.

Plaintiff states that while he was housed on death-row at MCAC, he sustained a back injury for which he was provided no medical treatment. He alleges medical treatment was withheld because his status as a death-row inmate and a policy prohibiting the expenditure of funds for medical repairs or therapies for death-row prisoners. Plaintiff states that, as a result, he has permanent back pain. In addition, plaintiff states he was emotionally traumatized because several of the men he had come to know and regard as friends were executed by the State while he was housed on death-row. As a result of the executions of his friends as well as "other traumatic experiences following the vacating of his death sentence," plaintiff claims he suffers from paranoid schizophrenia, severe depression, and post-traumatic stress disorder (PTSD). Plaintiff states he was never diagnosed with any of these psychiatric illnesses prior to his assignment to MCAC and death-row. ECF No. 1 at pp. 19 – 20.

Organized religious services were not made available to plaintiff during his assignment to MCAC. He claims that basic tenets of his faith include organized religious services with outside church leaders and lay person participation as well as religious education with religious leaders. He states as a result of being denied participation in organized religious services, his religious beliefs have become confused and uncertain, contributing to his depression and paranoia. Additionally, he claims legal reference and research resources were extremely limited at MCAC and drastically limited his ability to gain meaningful access to the courts. At MCAC, unlike other Maryland correctional facilities, there was no library. Plaintiff asserts the lack of resources prohibited him from researching issues relevant to his criminal appeal and resentencing as well as claims related to the instant complaint. ECF No. 1 at pp. 20 – 21.

3

Plaintiff also claims the lack of outdoor recreation at MCAC, as well as the limitation on out-of-cell activity to one hour daily during the week, contributed to his psychological issues. He maintains that had he been confined to a different prison he would have had several hours of out-of-cell activity daily. ECF No. 1 at pp. 21 – 22.

While confined at MCAC on death-row, plaintiff claims he was denied dental care. He states there was a policy in place which prohibited dentists working at MCAC to do anything more than pull teeth for death-row inmates. He claims he had all of his teeth when he was sentenced to death in 2000, but by the time he left MCAC he had less than half of his teeth and was experiencing severe pain in his mouth and jaws. He alleges if he had been confined to a different prison he would have had full access to dental care. ECF No. 1 at p. 22 - 23.

Plaintiff claims he was denied access to a telephone for nearly eleven months while assigned to MCAC general population and was therefore unable to maintain contact with family who lived out-of-state or close friends who lived nearby. ECF No. 1 at p. 23.

Plaintiff asserts he first became aware that he might have a claim regarding his incarceration at MCAC in August, 2010. At that time he began seeking information from the Division of Correction's Custodian of Records, Erin Julius. Plaintiff made three requests seeking the names and dates of employment for defendants as well as operations procedures and policies as they applied to death-row inmates at MCAC. He states Julius ignored his requests and sent only a short note stating that since MCAC is no longer a State facility, it does not matter how it was operated while plaintiff was confined there. Plaintiff alleges that Julius's refusal to provide the information violated the Maryland Public Information Act and caused a one-year delay in filing the instant case. ECF No. 1 at pp. 25 – 26.

Contrary to plaintiff's allegations, defendants state that death-row inmates were allowed privileges and property which were not allowed to other inmates housed at MCAC. ECF No. 18 at Ex 8. Plaintiff and other inmates on death-row were permitted to have video game systems, music CD's, alarm clocks and calculators. *Id.* They were also allowed to order food and stationery items from the commissary not offered to other inmates. *Id.* Death-row inmates laundered their own clothing with washers and dryers available exclusively to them, and were not required, as other inmates were, to send their clothes out of the facility to be cleaned. *Id.* While he was a death-row inmate, plaintiff received approximately fourteen hours each day for out-of-cell time, compared to the one hour accorded to the rest of MCAC's population. *Id.* Defendants state that leaving plaintiff on death-row allowed him to retain the privileges allowed to death-row inmates which were not provided to general population inmates housed at MCAC. *Id.*

Defendants further state that while he was at MCAC, plaintiff practiced the Catholic religion and was ministered to by Father Charles Canterna, who met with him on a regular basis. Father Canterna instructed him in confirmation for the Catholic faith and also received permission from his superiors to confirm plaintiff. According to Father Canterna, the sacrament of confirmation is important because it is recognized as the full acceptance of the Catholic faith. ECF No. 18 at Ex. 8 and 18.

Defendants claim plaintiff had access to health care evaluation and treatment at MCAC, which was provided in regularly scheduled clinics in accordance with the requirements of health care contracts, law, regulation and established procedures. Defendants further state that MCAC inmates had access to medical, mental health and dental services and also had access to a library with legal, educational, and reading materials. ECF No. 18 at Ex. 8 and Ex. 19, p. 5.

5

Defendant Erin Julius responded to plaintiff's two requests for information on August 9, 2010. ECF No. 18 at Ex. 20. In the letter responding to his request, plaintiff was directed to Division of Correction Directive (DCD) 110-12 to find information regarding assignment of inmates to death row. *Id.* Plaintiff's second request concerned how Maryland inmates are assigned to MCAC and, in response, Julius informed plaintiff that Maryland inmates were no longer housed at MCAC. *Id.* Defendants further state that plaintiff has filed just one grievance with the Inmate Grievance Office (IGO), on May 20, 2003, concerning an appeal of an Administrative Remedy Procedure (ARP) involving a radio and television. *Id.* at Ex. 21.

### Standard of Review

### Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1968-69 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 1969. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979).

### Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).   The

court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all

inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).   The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### Statute of Limitations

Defendants assert that many of plaintiff's claims are barred by the statute of limitations.

ECF No. 18.  There is no federal statute of limitations applicable to complaints filed pursuant to

42 U.S.C. §1983.   "To fill this void . . . courts . . . [must] select the state statute of limitations

7

'most analogous,' and 'most appropriate,' to the particular §1983 action, so long as the chosen limitations period [is] consistent with federal law and policy." *Owens v. Okure,* 488 U.S. 235, 239 (1989) (internal citations omitted).   The state statute of limitations most analogous and appropriate is that which governs personal-injury torts. *See Wallace v. Kato,* 549 U.S. 384, 387 (2007), citing *Owens v. Okure,* 488 U.S. 235, 249-250, (1989); *Wilson v. Garcia,* 471 U.S. 261, 279-280, (1985).  In Maryland the applicable statute of limitations is three years from the date of the occurrence. *See* Md. Cts & Jud. Proc. Code Ann.§ 5-101.

The complaint in the instant case was filed on December 12, 2011.  To the extent it concerns events taking place before December 12, 2008, those claims are time-barred. Plaintiff, however, seemingly anticipates the timeliness issue of his complaint and argues he did not discover the basis of his cause of action until December of 2010.  ECF No. 1.  Under the discovery rule, a cause of action accrues at the time the plaintiff first knows or reasonably should have known of the alleged wrong. *See Newell v. Richard*, 323 Md. 717, 723, 594 A. 2d 1152, 1155 (1991).  "Because some injuries are latent or otherwise difficult to discover, the 'date of the wrong' rule could have the effect of barring some claims before plaintiffs could discover that a wrong or a resulting injury had occurred." *Id.* The crux of plaintiff's claim is that the conditions to which he was subjected caused psychiatric illness.  Although it is likely plaintiff knew of his "injury" before the asserted date, this court will assume for purposes of this analysis that the basis of his claim was not discovered until 2010.

### Exhaustion of Administrative Remedies

The Prison Litigation Reform Act (PLRA) provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. It is of no consequence that plaintiff is aggrieved by a single occurrence, as opposed to a general conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir.2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir.2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Thus, plaintiff's claims must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D.Md.2003). The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D.Md.1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735, (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir.2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Defendants provide an affidavit from the director of the Inmate Grievance Office (IGO) stating that plaintiff filed only one grievance with the IGO which concerned an appeal from the disposition of an ARP filed at MCAC concerning a complaint about plaintiff's radio and television. ECF No. 18 at Ex. 21. Although the evidence offered to support defendants' claim that plaintiff has failed to exhaust administrative remedies is weak,[1] plaintiff does not refute the assertion. Rather, plaintiff claims "[t]he amount of money sought made this court to be the proper place to attack from that is why plaintiff never went through the [administrative remedy

---

[1] The failure of plaintiff to file an IGO complaint alone does not establish that he never filed administrative complaints regarding the conditions under which he was confined. For example, if his ARP was found meritorious he would not have filed a subsequent appeal to the IGO and his claim would have been exhausted.

process]." ECF No. 23 at p. 15.  The unavailability of the relief sought, however, does not excuse the failure to exhaust administrative remedies.  Indeed, this case is particularly illustrative of the wisdom of requiring exhaustion of administrative remedies.   The age of the claims asserted, together with plaintiff's failure to document his grievances through the administrative remedy procedure, has left defendants in the unenviable position of having to defend against allegations that are now impossible to investigate.  Defendants are left to explain policies and procedures as they existed at MCAC during the time plaintiff was there and cannot address how any of those policies affected plaintiff in particular.  The complaint, inasmuch as it concerns conditions of confinement not related to medical care,[2] must be dismissed for failure to exhaust administrative remedies.

## Medical Claims

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511

---

[2] The court takes judicial notice of the fact that complaints regarding medical care are never heard by the IGO and, therefore, there is no claim that plaintiff failed to exhaust administrative remedies insofar as his claims concern medical care.

U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer,* 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center,* 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton,* 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The claim asserted by plaintiff is that there was a policy in place at MCAC to deny death-row inmates all but the most rudimentary dental care and that he was denied medical treatment for a back injury. Defendants deny that any policy such as that described by plaintiff existed with respect to death-row inmates. Moreover they state that, to the extent plaintiff did not receive proper care, they are in no way responsible for preventing him from receiving the appropriate care. ECF No. 18. Indeed, all of the named defendants are correctional employees

who are not charged with the task of providing medical care to prisoners. Plaintiff does not allege that any of the individual defendants prevented him from receiving proper medical or dental care; rather, he simply postulates that he was denied care because he was on death-row. To the extent the claim seeks to impose liability on defendants on a theory of *respondeat superior*, the claim fails. It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no *respondeat superior* liability under § 1983). Defendants are entitled to judgment in their favor on the claims regarding medical care.

A separate order follows.

Oct. 22, 2012
Date

James K. Bredar
United States District Judge

13